## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

In re:

Bamberg County Memorial Hospital,

        Debtor.

Case No.

Chapter 9

**DEBTORS' MOTION FOR ORDER DETERMINING THAT PATIENT CARE OMBUDSMAN UNDER SECTION 333(a)(1) OF THE BANKRUPTCY CODE IS NOT NECESSARY AND MEMORANDUM OF LAW IN SUPPORT**

Bamberg County Memorial Hospital (the "Debtor") hereby moves for entry of an Order finding the appointment of a patient care ombudsman pursuant to 11 U.S.C. § 333(a)(1) is not necessary for the protection of patients in this case. In support of this Motion, the Debtor incorporates by reference its Memorandum in Support of its Statement of Qualifications Under 11 U.S.C. § 109(c) filed on even date herewith, and the Debtor would respectfully show unto this Court the following:

1.      The Debtor has filed a petition seeking relief under chapter 9 of the United States Bankruptcy Code ("Bankruptcy Code"). The Debtor, a public agency, was created in 1949 by act of the South Carolina Legislature to provide hospital facilities to the residents of Bamberg County (the "County").

2.      The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§157 and 1334. Venue of this case is proper in this Court pursuant to 28 U.S.C. § 1408.

3.      Debtor operates as a hospital located in the city of Bamberg, SC on 509 North Street a short distance from US Highway 301. Debtor is licensed for 59 beds but currently operates 25 beds with both private and semi-private rooms. The average daily census of Debtor

is 14 patients. Debtor was constructed in 1952 and had 32 beds. Over the years beds and services were added with the final addition bringing the total to 59 beds in 1982. In 2009, Debtor's building was renovated. The hospital has 1 operating room, 2 endoscopy rooms, and 1 procedure room along with 2 LDR rooms located in close proximity to the operating suite. The property on which the facilities exist and the physical facilities are owned by the County. The Debtor provides general medical and surgical care in inpatient, outpatient, and emergency room service areas. The Debtor has 11 physicians on active medical staff and 9 are Board Certified.

4.     Year-to-date, for the six months ending March, 2011, net revenue of the Debtor was $7,654,007. This level of revenue is $2,249,139 less than the budget of $9,903,146 and $2,658,675 less than the same period of time last year. Accordingly, year to date, for the six months ending March, 2011, the Debtor has operated at a loss of $1,525,197.

5.     The Debtor has been able to stay in business only because the County has provided funding to the Debtor. The Debtor has been informed by the County that the County does not have the ability or intent to continue funding the operating losses of the Debtor in the future. Even with the County providing supplemental funding, the Debtor has struggled to pay its debts in the ordinary course of business.

6.     On or about May 20, 2011, the South Carolina Department of Revenue served a notice of levy on SC Bank & Trust to seize the bank accounts of the Debtor which resulted in a freeze of approximately $205,000.00. As a result of the account freeze on these funds, Debtor's ability to operate has been significantly impaired and necessitated the expedited filing of the Debtor's chapter 9 petition.

7.     Pursuant to section 333(a)(1) of the Bankruptcy Code, a patient care ombudsman need not be appointed if the court finds that an ombudsman is not necessary for protection of the

patients under the specific facts of a case. As set forth in detail below, there are processes and mechanisms in place by which the Debtor monitors and improves the quality of care it provides to patients and protects patient privacy. These mechanisms provide the necessary protection for patients and therefore a court appointed patient care ombudsman is not necessary and would serve only to subject the Debtor to unnecessary expense.

## I. PATIENT PROTECTION

The Debtor believes that its pre-existing system for monitoring patient care and safety is effective and provides the necessary protection for patients which is beyond what an appointed patient care ombudsman could provide.

a.    <u>State and Regulatory Oversight of Debtor</u>.

The Debtor is reviewed annually by the South Carolina Department of Health and Environmental Control ("DHEC") and Centers for Medicare and Medicaid Services ("CMS").[1] The Debtor is in full compliance with the patient care and safety standards established by CMS and DHEC. Additionally, the Debtor maintains the appropriate and necessary licenses to operate in the State of South Carolina, which license is renewed annually, and granted based on surveys, patient complaints, ability to meet emergency preparedness and life safety requirements. The Debtor is subject to inspections by DHEC for licensing and certification purposes, to monitor compliance with regulations, and to follow up on patient complaints. If the Debtor failed a DHEC inspection or failed to correct an issue of non-compliance with federal or state regulations, the Debtor could lose its license to operate as a hospital.

The Debtor must also follow Occupational Safety and Health Administration ("OSHA") guidelines.

---

[1] CMS's mission is to ensure effective health care coverage and promote quality care for beneficiaries of Medicare and Medicaid.

b.      Internal Operating Guidelines.

The Debtor is dedicated to providing excellent services with compassion and integrity to all of its customers.  The Debtor has a patient care plan which provides that patient care is in an appropriate and planned manner consistent with the patient rights and needs.  In addition, the plan includes identification of necessary needs for discharge that are incorporated into the plan of care and coordinated with other agencies/resources as needed to provide a continuum of care.

The Debtor informs, in writing, each patient as the time of admission of the patient's rights.  Each patient receives The Patient's Bill of Rights and Responsibilities, Medicare Rights, Louis Blackman Act, and Privacy Practice from the Registrar.

The Debtor maintains the following grievance procedure should a patient feel that any of their rights have been violated during a visit or admission to the hospital:

1.  Notify the Director of Nursing, Charge Nurse, Administrator or physician of their grievance.

2.  Supervisors are responsible for initiating the Complaint form and documenting any pertinent information to which they have access.

3.  Supervisors and Department Heads are responsible for investigating and resolution of complaints.

4.  If a satisfactory solution is not reached after taking this action, they may meet with the Administrative Staff which is composed of the Director of Nursing, Medical Directors and Administrator.

5.  The patient has the right to access to protective services.

6.  Grievances may also be taken to outside representatives of the persons choice such as The State Ombudsman Office.

   c. <u>Patient Ratios</u>

   The average length of impatient stay for the fiscal year ending September 2010 was 3.23 days.  The staffing ratios for each patient is based upon the patient's needs.  Staffing assignments are made according to the following specific guidelines.  The acuity level of the patient is based on the following factors and  is documented on the patient's initial assessment.  There is not a scoring system in place.  Patient level of acuity is based on the information documented from the factors below.  All initial assessments must be signed off by a Registered Nurse.

1. Type and Number of medications the patient is on.

2. Patient's Respiratory Status – Signs of Respiratory distress requires more attention from nursing staff.

3. Infection Control Issues – Based on the type of infection, nurse may be limited to other patient rooms

4. Psychosocial Behavior

5. Self Care Ability – If patient unable to perform daily care activities this factor increases the need for extra nursing care.

Nurse to patient ratio's without factors that may affect acuity level is 1 Nurse to 5 Patients.

   d. <u>Presence of Safeguards to Ensure Appropriate Care.</u>

   On or about May 2, 2011, the Debtor's Board retained Healthcare Management Partners, LLC ("HMP"), an independent hospital turnaround management company, to supervise and direct the general management and operations of the Debtor and oversee the delivery of patient services.  HMP is a nationally recognized expert in the management of financially distressed hospitals and other types of healthcare providers.  In other bankruptcy cases involving HMP acting as the management company for debtors, courts have determined that appointment of an

Ombudsman was unnecessary in part based upon the management and direction of HMP to insure the protection of its patients. *See In re Natchez Medical Center,* S. Dist. MS, Case No. 09-00477; *In re Physicians and Surgeons Hospital Group d/b/a Tri-Lakes Medical Center,* N. Dist. MS, Case No. 07-12967. HMP's Statement of Qualifications is attached hereto as Exhibit 1.

## II. ARGUMENT

If the debtor in a case under chapter 9 is a health care business, the appointment of a patient care ombudsman is mandated by § 333(a)(1), not later than 30 days after commencement of the case, to monitor the quality of patient care and to represent the interests of the debtor's patients "unless the court finds that appointment of such ombudsman is not necessary for the protection of patients under the specific facts of the case." An ombudsman appointed under § 333(a)(1) monitors the quality of patient care provided to patients of the debtor and reports to the court regarding the quality of patient care provided to patients of the debtor. 11 U.S.C. § 333(b).

It is clear the Debtor is a "health care business" under § 107(27)(A), as it is a public agency engaged in offering health care services through its hospital facilities to the residents of the County, and therefore §333(a)(1) is applicable to the Debtor.

### A.    A Patient Care Ombudsman is Not Necessary.

In determining whether a patient care ombudsman is necessary under the specific facts of a case, courts have examined the following nine non-exclusive factors: 1) the cause of the bankruptcy; 2) presence and role of licensing or supervising entities; 3) debtors past history of patient care;  4) the ability of the patients to protect their rights; 5) level of dependency of the patients on the facility; 6) likelihood of tension between the interests of the patients and the debtor;  7) potential injury to the patients if the debtor drastically reduced its level of patient

care; 8) presence and sufficiency of internal safeguards to ensure appropriate level of care; and 9) impact of the cost of an ombudsman on the likelihood of a successful reorganization. *In re Valley Health Sys,* 381 B.R. 756 (Bankr. C.D. Cal. 2008); *In re Alternate Family Care*, 377 B.R. 754, 758 (Bankr. S.D. Fla. 2007).   "Other factors to be considered by the court include: (1) the high quality of the debtor's existing patient care; (2) the debtor's financial ability to maintain high quality patient care; (3) the existence of an internal ombudsman program to protect the rights of patients, and/or (4) the level of monitoring and oversight by federal, state, local, or professional association programs which renders the services of an ombudsman redundant." *Valley Health,* 381 B.R. at 761 (citing 3 *Collier on Bankruptcy P 333.02*, at 333-4 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. 2007)).

Since the enactment of section 333, bankruptcy courts have exercised their discretion and held the appointment of an ombudsman unnecessary. *See In re RAD/ONE, P.A.*, 2009 Bankr. LEXIS 417 (Bankr. N.D. Miss. Feb. 24, 2009)[2] (court declined to appoint patient care ombudsman where debtor had an existing internal ombudsman program and was compliant with regulatory agency requirements); *In re Valley Health Sys.*, 381 B.R. 756 (Bankr. C.D. Cal. 2008) (court declined to appoint patient care ombudsman where health care district had no history of patient care problems and adequate internal monitoring systems); *In re Saber, M.D.,* 369 B.R. 631 (Bankr. D. Colo. 2007) (court declined to appoint patient care ombudsman where debtor was a single physician entity, with 20 years of experience, in good standing with a positive cash flow who filed bankruptcy for reasons unrelated to patient care); *In re Medical Assocs. of Pinellas,* 360 B.R. 356, 361 (Bankr. M.D. Fla. 2007) (court declined to appoint patient care ombudsman where debtor had ceased operation); *In re Total Woman Healthcare Center, P.C.,* 2006 Bankr. LEXIS 3411 (Bankr. M.D. Ga. Dec. 14, 2006) (court declined to appoint patient care

---

[2] Copies of unpublished cases cited herein are attached hereto as Exhibit 2.

ombudsman where patient care had not been affected by bankruptcy and debtor's obligations not related to patient care).

Considering the factors under the specific facts and circumstances in this case, the balance weighs against the appointment of a patient care ombudsman pursuant to § 333(a)(1).

**Factor 1: Cause of Bankruptcy**:  Debtor is seeking relief under chapter 9 due to a shortfall of revenue to pay its debts, not because there are any allegations of deficiency patient care.

**Factor 2: Presence of Licensing/Supervising Entities:** The Debtor is subject to substantial monitoring by a variety of federal and state regulatory agencies as described above. Additionally, Debtor is compliance with all applicable federal and state regulations.

**Factors 3 and 8: Debtor's Past History of Patient Care/Internal Safeguards:**   The Debtor has served the residents of the County since 1952.  The Debtor has adopted internal procedures to ensure the highest level of patient care and to resolve expeditiously complaints that may arise concerning patient care.  Furthermore, there is no evidence of action taken by any federal or state regulatory authority against the Debtor due to patient care issues.

**Factors 4 and 6:  Ability of the Patients to Protect Their Rights; The Likelihood of Tension Between the Interests of the Patients and the Debtor**:  The Debtor has implemented internal quality controls and procedures for monitoring patient care at the hospital.  There are procedures in place for handling and resolving any complaints made by patients.  The patient are informed, in writing, of their rights upon being admitted to the hospital.

**Factor 5:  Level of Dependency of Patients on the Facility.**  The Debtor provides general medical and surgical care in inpatient, outpatient, and emergency room service areas at the hospital.  The patients under the Debtor's care are dependent on the Debtor for their health,

safety and welfare when at the hospital, however, the average length of inpatient stay is 3.75 days.

**Factor 7: Potential Injury to Patients if the Debtor Drastically Reduced its Level of Patient Care.** The Debtor is meeting and/or exceeding national staffing ratios. HMP is working to ensure that patient care is provided in an appropriate and planned manner consistent with patient's rights and needs.

**Factor 9: Impact of the Cost of an Ombudsman on the Likelihood of a Successful Reorganization.** For the reasons discussed above, the Debtor does not believe a patient ombudsman is necessary in this case to protect the interest of the patient and would unnecessarily duplicate services already being provided to the Debtor. The appointment of a patient care ombudsman may result in substantial administrative expense to the Debtor's estate, which payments would delay or impair the claims of Debtor's unsecured creditors. Given the level of internal controls and oversight by federal and state agencies and the management of HMP, a nationally recognized hospital management company, the services of a patient care ombudsman would be redundant and "would merely add another layer of bureaucracy to an already heavily regulated and supervised" entity. *See Alternate Family Care,* 377 B.R. at 761.

Weighing the above factors under the specific facts and circumstances in this case, the balance weighs against the appointment of a patient care ombudsman pursuant to § 333(a)(1). Currently, there are processes and mechanisms in place by which the Debtor monitors and improves the quality of care it provides to patients and protects patient privacy. These mechanisms provide the necessary protection for patients, and therefore a court appointed patient care ombudsman is not necessary and would serve only to subject the Debtor to unnecessary expense.

### III.    CONCLUSION

For all the foregoing reasons, the Debtor respectfully requests that the Court issue its order determining that the appointment of a patient care ombudsman in this case is not necessary.

**HAYNSWORTH SINKLER BOYD, P.A.**

**By:**    /s/ Stanley H. McGuffin
           District ID No. 2833
           Lindsey Carlberg Livingston
           District ID No. 9518

Post Office Drawer 11889
Columbia, South Carolina 29211
(803) 779.3080 Tel
(803) 765.1243 Fax
bshortl@hsblawfirm.com
llivingston@hsblawfirm.com

June 20, 2011                       Attorneys for Debtor

 Healthcare Management Partners, LLC

# STATEMENT OF
# QUALIFICATIONS

April, 2011

Listen
•
Evaluate
•
Implement

*Implement*

EXHIBIT 1

*Statement of Qualifications*

# TABLE OF CONTENTS

## ABOUT HEALTHCARE MANAGEMENT PARTNERS                                    3
 – Management Services                                                    6
 – Financial Advisory                                                    10
 – Litigation Support                                                    12
 – Modeling and Data Analysis Tools                                      14

## CLIENTS OUR PROFESSIONALS HAVE SERVED
                                                                         18

## SELECTED CASE STUDIES

**MANAGEMENT SERVICES**
 – Successful Chapter XI Reorganization of a Bankrupt Two-campus Not-For-Profit Hospital    20
 – Successful Chapter IX Reorganization of a Financially Distressed County-Owned Hospital    21
 – Suburban Not-For-Profit Healthcare System with a Distressed Continuing Care Retirement
   Community                                                            22
 – Texas Nursing Homes                                                  23
 – Investor Owned Specialty Hospital Company                            23

**FINANCIAL ADVISORY**
 – Erickson Retirement Communities, Inc.                                25
 – Behavioral Health Managed Care Company                               27
 – Publicly Traded Hospital System                                      28
 – 300 Bed Community Hospital                                           28
 – Deutsche Bank's Home Health Care Services Group                      29
 – Secured Commercial Lenders to Hospitals and Hospital Systems         30

**LITIGATION SUPPORT AND EXPERT TESTIMONY**
 – "Big Four" Accounting Firm: Expert Testimony                         31
 – National Long-Term Care Provider: Damages Expert                     32
 – Not-For-Profit Multi-Hospital System: Healthcare Industry Expert     33
 – Post-Acquisition Purchase Price Dispute: Arbitrator                  34
 – Distressed Tax Exempt Bond Fund: Fraud Investigator                  35
 – Creditor's Litigation Trust: Expert Testimony                        36
 – National Top Ten Medical College: Expert Testimony                   36
 – Multi-Hospital Not-For-Profit System: Expert Testimony               37
 – National Investor Owned Company: Internal Medicare Fraud Investigator    38
 – General Acute Care Hospital: Expert Testimony                        39

## BIOGRAPHIES OF SENIOR LEADERSHIP                                      40

*Statement of Qualifications*

# ABOUT HEALTHCARE MANAGEMENT PARTNERS

## WHO WE ARE

Healthcare Management Partners, LLC is a firm led by a team of C-Level healthcare executives that quickly define and solve problems to produce exceptional results for healthcare organizations and their stakeholders.

With its extensive experience, Financial Modeling and Data Analysis Tools and action-based business model, HMP provides senior executive led Management, Financial Advisory and Litigation Support services to hospitals and other healthcare organizations and their creditor, investors and business partners.

## MANAGEMENT SERVICES

HMP is a hospital and healthcare services management firm.  All of its senior executives have decades of healthcare experience including CEO, COO, and CFO assignments across the spectrum of healthcare service providers. Our leaders have deep experience in building and operating thriving healthcare organizations.  Part of that experience includes taking decisive action in crisis or turnaround situations.  This knowledge base gives HMP a unique perspective and all the tools necessary to handle the issues facing any healthcare provider organization.

HMP provides **Hospital Contract Management, Turnaround Management and Interim or Crisis Management services.**

## FINANCIAL ADVISORY

The complex and ever-changing nature of the healthcare markets can test even the strongest organizations. Healthcare Management Partners serves as financial advisor to hospitals and other healthcare providers facing strategic decisions directly impacting current or future financial performance.

HMP frequently serves banks, bond holders, private equity firms, or committees of unsecured creditors, and their legal and accounting advisors in conjunction with complex business transactions or restructurings involving healthcare providers.

Our services include **Creditor Advisory, Operational and Financial Due Diligence.** Unlike many of our competitors, every financial advisory services engagement is led, on the ground, by experienced C-Level healthcare executives.

*Statement of Qualifications*

## LITIGATION SUPPORT

HMP's Testifying and Consulting Experts rigorously incorporate economic and accounting principles into sophisticated financial, statistical and data mining models for the calculation of damages and lost profits. Our experts prepare and interpret economic and statistical analyses and present their findings effectively in court to regulatory authorities or to healthcare clients.

Our team is skilled at performing comprehensive investigations, providing in-depth analyses of complex financial transactions, preparing clear and concise reports, and providing compelling expert testimony to courts, arbitrators, mediators and juries. Our professionals bring a proven track record and reputation for providing exceptional service.

HMP professionals have assisted boards of directors, and management of both private and public healthcare organizations.

In particular, we have assisted in responses to investigations and inquiries initiated by or involving regulatory and law enforcement bodies related to financial reporting (GAAP), whistleblower allegations regulatory compliance reviews, securities law violations and other misappropriation of assets.

## FINANCIAL MODELING AND DATA ANALYSIS TOOLS

Over many years of successful client engagements, Healthcare Management Partners has developed a number of sophisticated software tools and data sets to enable it to rapidly assist its clients and corporate partners to achieve their unique business objectives. Our professionals employ these tools to quickly evaluate our healthcare clients' market placement, productivity, financial condition and short term debt capacity to meet pressing working capital needs.

We have also developed a tool to accurately evaluate the payment patterns and practices of third party payors to assist providers in maximizing their collection efforts.

Finally, HMP has developed a unique set of tools that enable it to minimize the cost of managing the administrative burdens of a healthcare client in bankruptcy.

*Statement of Qualifications*

## OUR APPROACH

Our approach to every assignment is built upon the straightforward application of three simple steps or guiding principles.

**Listen –** We listen carefully and continuously to our clients, their key stakeholders and the marketplace throughout each assignment.

**Evaluate –** We employ comprehensive fact based analysis to evaluate and validate assumptions, findings and recommended actions.

**Implement –** We have a bias toward "getting it done." We take decisive action to quickly and effectively implement strategies to convert opportunities and eliminate problems

## THE HMP DIFFERENCE

*Total commitment to providing C-Level attention throughout each assignment by experienced healthcare executive*

*Small, dedicated teams of operating professionals for each assignment*

*Absolute integrity of our fact-based approach*

*Action-oriented diagnostic and business planning processes*

*Proven ability to drive positive outcomes in all sectors of healthcare*

*Depth of HMP network, providing critical access to key resources and people*

*Commitment to the highest professional standards*

*Statement of Qualifications*

# MANAGEMENT SERVICES

## HOSPITAL CONTRACT MANAGEMENT, TURNAROUND MANAGEMENT, AND INTERIM AND CRISIS MANAGEMENT OF HEALTHCARE PROVIDERS

HMP is a hospital and healthcare services management firm. All of its senior executives have decades of healthcare experience including CEO, COO and CFO assignments across the spectrum of health services. Examples of specific assignments include serving as the Chief Executive Officer (CEO) of the following types of healthcare organizations:

- Religious affiliated or sponsored multihospital systems
- Free standing not-for-profit or government owned community hospitals
- University and major teaching hospitals
- Single site and multihospital regional operations for investor owned hospital management companies
- De Novo  organizations (start-up) planning, construction and operation of new general acute care hospitals, free-standing heart and cancer hospitals, a continuing care retirement community and many other related facilities
- Hospitals that are in bankruptcy or for sale
- Financially distressed skilled nursing facilities
- Home health, hospice and physician practices

HMP's senior management team has deep experience in building and operating thriving healthcare organizations. Part of that experience includes taking decisive action in crisis or turnaround situations. This knowledge base gives HMP a unique perspective and all the tools necessary to handle the issues facing any healthcare provider organization.

**"HMP'S SENIOR STAFF MEMBERS ARE PROFESSIONAL HEALTHCARE SERVICE EXECUTIVES WHO ALSO POSSESS CONSULTING SKILLS, NOT PROFESSIONAL CONSULTANTS. WE UNDERSTAND AND ARE COMMITTED TO THE PROVISION OF QUALITY HEALTHCARE SERVICES AT EVERY PROVIDER ORGANIZATION IN WHICH WE HAVE A MANAGEMENT ROLE."**

## Hospital Contract Management

HMP is positioned to undertake the long term (3 to 5 years) contract management of hospitals of all sizes and stages of development. Our executives are experienced in leading the development of new or replacement general acute care or specialty hospitals or the turnaround and repositioning of existing hospitals. They can effectively lead initiatives in the following areas:

*Statement of Qualifications*

**Strategic Leadership**
- Market Positioning
- Brand Development
- Service Line Development
- Capital Planning and Investment
- Physician Relations
- Physician Integration
- Continuum of Care
- Corporate and Medical Staff Governance
- Mission and Vision
- Design and Implementation of Strategic Plans

**Clinical Excellence**
- Clinical Process Redesign
- Evidence-Based Care
- Resource Utilization and Cost of Quality
- Pay for Performance
- Care and Case Management Processes
- Quality and Safety Indicators

**Operational Excellence**
- Patient Throughput
- Emergency Department Clinical Efficiency
- Surgical Services Clinical Efficiency
- Inpatient Length of Stay and Level of Care
- Human Resources Management
- Ambulatory Care
- Hospice and Home Care
- Best Practices and Operating Metrics

**Financial Performance Optimization**
- Revenue Cycle
- Business Office Consolidation
- Managed Care Contracting
- Risk Management and Insurance
- Budgeting / Financial Planning
- Capital Programs
- Supply Chain
- Financial Reporting and Accounting

We will be directly accountable to the board of directors and will assume full responsibility to plan, organize, staff, direct and control the successful and cost effective operations of the hospital.

*Statement of Qualifications*

Because HMP is not a management consulting firm, our contract management executives are free to always bring the best and most cost effective solution, from whatever source, to the hospital should outside assistance prove necessary to implement a given strategic or tactical initiative.

## Turnaround Management

HMP's executives have served as chief restructuring officers of healthcare companies through bankruptcies, crisis situations and in the early stages of high-profile criminal and civil fraud investigations. In each of these situations, their leadership helped these organizations bolster performance through discipline and carefully planned action.

Some consultants assess your problems and provide a recommended course of action. But HMP executives take the helm of failing organizations and assume direct responsibility for transforming them. Time and again, they have succeeded in revitalizing providers of all kinds, from a rural nursing home chain to a 1,000 bed teaching hospital or a 179 bed county owned community hospital.

There are no quick fixes in turnaround management, but HMP has developed a highly effective, streamlined approach for achieving lasting improvements as soon as possible. We begin by developing a strong knowledge base of your organization. Individuals from every level of the organization are interviewed including management, medical and nursing staff members, board of directors, employees, patients and their families. Their input, combined with a depth of healthcare industry knowledge, allows HMP to:

- Stabilize the crises
- Identify immediate opportunities and challenges
- Develop a strategic plan, including milestones and deadlines
- Define expected outcomes
- Build consensus with all constituents – medical and nursing staffs, management, unions, vendors, patients,  and the local community
- Change cultures, and
- Optimize performance

In all of its healthcare provider turnaround assignments, HMP has successfully designed and executed plans that simultaneously added patient volume and revenues, reduced costs and improved profitability and cash flow.

From the outset, HMP builds on each organization's strengths, working side-by-side with management, directors and other key stakeholders to drive desired results. HMP also focuses on winning the support and active participation of the medical and nursing staffs, which is fundamental for delivering quality healthcare services and improving financial results.

Beyond anchoring successful turnarounds, this approach leads to the identification and implementation of additional revenue-generating opportunities.

*Statement of Qualifications*

During a hard restructuring either within or outside bankruptcy, HMP works alongside management to develop and quickly implement a plan that makes sense given the organization's resource constraints and market positioning. We are on the ground leading specific aspects of the turnaround process and helping to manage complex constituency relations and communications. As part of this process our executives will:

- Address immediate working capital needs
- Stabilize core operations
- Review financial projections and develop actionable business plans
- As required, design and implement any necessary operational restructuring
- Implement ongoing communications processes with key constituencies
- Develop and immediately implement cost reduction initiatives
- Design and implement cash conservation guidelines and controls
- Develop employee incentive plans
- Identify and dispose of non-core assets
- Develop pre-bankruptcy plans
- Assist with bankruptcy case administration, serving as Bankruptcy Trustees and Examiners
- Manage creditor communication and negotiation processes

## Interim and Crisis Management

HMP serves in interim and crisis management roles when required to help guide providers through periods of crisis or change. Companies that are underperforming and in crisis or healthy but in transition, may need additional experienced healthcare industry leaders to stabilize operations and improve financial performance or maintain continuity in the rapid implementation of critical strategic initiatives.

Our professionals can offer critical advice or step into key leadership positions such as Chief Restructuring Officer, Chief Financial Officer, or Chief Executive Officer to provide needed stability during periods of change.

Our proven interim management capabilities add valuable support in crisis situations. We immediately fill critical leadership vacancies and shorten the lead-time for implementing specific initiatives. HMP provides much needed leadership and speed to create value in executing crisis management and restructuring plans. **Our crisis and interim management services include:**

- Immediate staffing of critical senior management positions
- Reducing lead-time for implementing strategic initiatives
- Managing communications processes with Members of the medical and nursing staffs, board members, employees and regulators, and if required
- Bankruptcy process planning and administration

*Statement of Qualifications*

# FINANCIAL ADVISORY

The complex and ever-changing nature of the healthcare markets can test even the strongest organizations. Healthcare Management Partners serves as advisor to hospitals and other healthcare providers facing strategic decisions directly impacting current or future financial performance.

HMP also frequently serves banks, bond holders, private equity firms, or committees of unsecured creditors and their legal and accounting advisors in conjunction with complex business transactions or restructurings involving healthcare providers. We provide creditor advisory and operational and financial due diligence.

Unlike many of our competitors, every financial advisory services engagement is led, on the ground, by experienced C-Level healthcare executives. Our project experience has been diverse.

For example, in a recent project for Deutsche Bank, HMP analyzed the effects of proposed major and highly complex changes to the Medicare payment system for the home health agency market. HMP's analysis identified which companies would benefit and which would be hurt—and by how much—by the proposed changes.

In another case, HMP worked with a very successful behavioral health managed care organization in the Northeast to set a new strategic direction and optimize the organization's enterprise value. HMP played a pivotal role in executing the plan, which included identifying and negotiating with potential merger partners. As a direct result of HMP's leadership, the regional MCO is now the behavioral health arm of the nation's largest Medicaid managed-care organization.

## Creditor Advisory

HMP provides support to creditor groups with interests in Healthcare provider organizations engaged in complex restructuring, bankruptcy and distressed situations. Our services enable lender groups, bondholders, trade creditors, investors and others to quickly and accurately evaluate the risks and opportunities associated with a provider's business plan. Our efforts are designed to help all of the parties make informed business judgments that will maximize overall recoveries.

**Our creditor advisory services include:**
- Review of short-term cash flow projections
- Analysis of cash conservation efforts and procedures
- Analysis of business plans, including risks and opportunities
- Valuation of collateral packages on both a going concern or liquidation basis
- Assistance in negotiation of amendment and forbearance agreements
- Review and assessment of restructuring alternatives
- Performance monitoring following business plan implementation

*Statement of Qualifications*

## Financial Due Diligence

HMP's financial due diligence is provided by a team of experienced healthcare executives who analyze quality of earnings and working capital requirements through financial statements, patient mix and market placement, and on-site discussions with medical staff, management and board members. Our focused and tailored approach enables us to rapidly identify and understand potential deal breakers, value drivers and other areas of interest specific to our clients. We perform both buy-side and sell-side due diligence.

**Our financial due diligence services include:**
- Assessment of the target provider's quality of earnings, including the identification of overly aggressive accounting policies and the assessment of the adequacy of third party contractual allowances, as well as GAAP accounting
- Analysis of the cash flows revenue cycle (e.g., working capital changes, capital expenditures, etc.)
- Review of on and off balance sheet assets and liabilities, including significant operating lease obligations
- Use of our proprietary financial modeling and data analysis tools to assess market position, payor mix to specifically identify market opportunities as well as trends in profitability and significant concentrations of risk
- Evaluation of management's financial projections and business plans
- Comprehensive discussion with management and their advisors
- Performance of both buy-side and sell-side due diligence

## Operational Due Diligence

Informed lenders and investors understand that successful transactions only start with a full understanding of historical and projected financial information. To maximize returns while minimizing risks, hospitals and other providers must continuously improve operational efficiency, identify and convert market opportunities, and maximize the efficiency of cash flow. HMP's staff of experienced healthcare executives assists our clients in analyzing the quality and efficiency of critical patient services and processes. From our thorough fact-based analysis, we identify, quantify and validate opportunities for EBITDA improvement. Our integrated operational and financial due diligence staff work together closely to quickly assemble a comprehensive picture of the investment opportunity.

*Statement of Qualifications*

# LITIGATION SUPPORT

## Litigation Support and Expert Testimony

Disagreements and disputes among organizations in the healthcare field are inevitable. HMP can apply its **Customized Data Mining and Analysis** capabilities, sophisticated modeling and benchmarking tools to produce thorough and accurate analysis and documentation for legal disputes. When the issues cannot be resolved through settlement and end up in court, HMP's senior executives are trained to enter the courtroom and provide expert testimony based on their extensive healthcare management experience and analysis.

HMP combines its quantitative strengths with hard-won healthcare industry operating experience to effectively evaluate qualitative issues involving the organization and delivery of patient care. The goal is to get to the bottom of the disagreement in a disciplined way, digging deep to determine precise facts.

### Testifying and Consulting Experts

For a healthcare organization facing complex litigation involving contract disputes, Medicare fraud allegations or liability analysis, you need the support and advice of experienced professionals who can provide independent and objective expert opinions.

HMP's Testifying and Consulting Experts rigorously incorporate economic and accounting principles into sophisticated financial, statistical and data mining models for the calculation of damages and lost profits. Our experts prepare and interpret economic and statistical analyses and present their findings effectively in court, to regulatory authorities or to healthcare clients.

HMP's professionals consult and testify on various types of damages claims, including Medicare fraud, lost profits, loss of value, econometric and statistical analysis, restitution, contract damages, market definition and competition analysis.

**Testifying and Consulting Experts services include**:
- Accounting and Financial Reporting
- Bankruptcy Fraud and Litigation
- Breach of Contract Claims
- Business Interruption
- Economic Damages and Lost Profits
- Economic Modeling and Forecasting
- Financial Investigations
- Expert Witness Testimony
- Medicare and Medicaid Fraud and Abuse
- Professional Malpractice (Accounting, Consulting and Hospital Management or Turnaround)

*Statement of Qualifications*

## Investigations

Today, Healthcare Providers are facing unprecedented scrutiny from internal and external parties. Financial, accounting and fraud investigations, business disputes and regulatory probes have become burdensome and complicated. Providers and their legal counsel need a dedicated and specialized team of healthcare industry professionals with deep financial and accounting skills at their side to confront these challenges.

Our team is skilled at performing comprehensive investigations, providing in-depth analyses of complex financial transactions, preparing clear and concise reports, and providing compelling expert testimony to courts, arbitrators, mediators and juries. Our professionals bring a proven track record and reputation for providing exceptional service.

Healthcare Management Partners brings singular experience and knowledge to this work. HMP senior executives have led or participated in the forensic accounting teams of two of the biggest Medicare frauds in history—HCA and HealthSouth. They are now providing litigation support for another massive Medicare fraud case.

HMP professionals have assisted boards of directors, and management of both private and public healthcare organizations. In particular, we have assisted in responses to investigations and inquiries initiated by or involving regulatory and law enforcement bodies related to financial reporting (GAAP), whistleblower allegations regulatory compliance reviews, securities law violations and other misappropriation of assets.

**Our Investigation services include:**
- Accounting Irregularities
- Bankruptcy Fraud
- Stark Violations
- Embezzlement of Funds
- Patient Billing or False Claims Act Violations
- Regulatory Compliance and Enforcement
- Receiver's and Examiner's Roles

*Statement of Qualifications*

# MODELING AND DATA ANALYSIS TOOLS

Over many years of successful client engagements Healthcare Management Partners has developed a number of sophisticated tools to enable it to rapidly assist its clients and corporate partners to achieve their unique business objectives. In turn, our professionals can employ these tools to quickly evaluate our healthcare client's market placement, productivity, financial condition and short term debt capacity to meet pressing working capital needs.

We have also developed a tool to accurately evaluate the payment patterns and practices of third party payors to assist providers in maximizing their collection efforts.

Finally, HMP has developed a unique set of tools that enable it to minimize the cost of managing the administrative burdens of a healthcare client in bankruptcy.

## HMP METRICS

### Peer Group Adjusted Performance Measurement for Healthcare Providers

HMP Metrics uses a custom electronic data base which includes the data contained in the *Healthcare Cost Report Information System* (*HCRIS*) from more than 200,000 Medicare Cost Reports filed by hospitals, nursing homes, home health agencies and other providers since 1994. Additionally for hospitals only, the HMP Metrics database also includes selected data elements from the *Medicare Provider Analysis and Review* (*MEDPAR*) database and data sets licensed by HMP from credit rating agencies and healthcare industry trade associations.

Using proprietary filters the date contained in the HMP Metrics database has been "scrubbed" to exclude incorrect, partial period or statistically aberrant data elements for individual hospitals or health systems. This data validation process enables HMP Metrics to produce highly accurate and defensible peer group comparisons for dozens of standard industry metrics.

HMP can easily create customized reports and mix or create new peer groups and compare them to state or national benchmarks. Examples of peer groups that a user might wish to examine include:

- Hospitals members of a single multihospital system
- Hospitals with a specific long term debt rating (BBB, A-, AA, etc.)
- Hospital members of specific hospital trade association (CHA, NCHRI, AAMC, etc.)
- Hospitals by ownership, size, geographic region or teaching status
- Hospitals with bonds outstanding issued by a specific health care facilities bond authority

The diversity of peer groups and metrics that can be measured is almost limitless. In addition, for each peer group comparison and metric, HMP Metrics also produces the peer group mean and median values and associated record counts for each quartile within the peer group.

*Statement of Qualifications*

HMP Metrics will also provide the number of records (cost reports) that were excluded from the computation of that particular metric.

## Patient Migration Studies (Market Share Analysis)

HMP licenses and is expert at the analysis of data contained in the *Medicare Provider Analysis and Review* (*MEDPAR*) database. *MEDPAR*, which is updated annually, contains over 100 data elements for all Medicare in and outpatient claims. HMP has models built to enable it to use *MEDPAR* as well as state level Medicaid and patient billing databases, if available, to determine hospital market share by major diagnostic category (MDC), conduct patient migration studies and prepare analysis related to allegations of fraud and abuse or other corporate compliance issues.

# Hospital Financial Model

## (60 Month Projected Financial Statements)

The Hospital Financial Model is a modular, yet integrated, financial model that enables the user to quickly and accurately, build operating budgets, test the financial sensitivity of alternative operating scenarios, and evaluate business risk. Using a control board that contains variable values for all key forecast assumptions, the user can quickly assess the financial impact of alternative assumptions or business risk profiles.

- Historical In and Outpatient Origin
- Definition of Historical In and Outpatient Geographic Service Areas
- Medical Staff Profile and Historical Utilization
- Competitor Profile
- Historical and Projected Inpatient Demand
- Historical and Projected Outpatient Demand
- Historical and Projected Units of Service (UOS)
- Historical and Projected Revenues and Expenses by Cost Center
- Historical and Projected Financial Statements
- Historical and Projected Key Financial Ratios
- Projected Debt Capacity

When this tool is combined with our customized data mining and analysis capabilities and used in concert with HMP Metrics, we can rapidly diagnose operating problems and opportunities and perhaps of equal or greater merit, communicate those findings to key constituencies in a clear actionable manner.

*Statement of Qualifications*

## Patient Accounts Receivable Financing Borrowing Base Calculation (BBC)

HMP has developed a process and companion financial model to enable it to very rapidly compute a hospital's borrowing base availability for which active patient accounts receivable (or the revenue there from) are used as collateral for the underlying credit facility. The model, which takes a day or two to specifically map to an individual hospital's patient accounting system, will enable the hospital to compute its borrowing base on a daily or weekly basis and produce a valid "Officer's Certificate" to enable it to draw on an available credit facility.

This tool, which was created to mirror the strict documentation standards of a leading lender to the healthcare industry, was specifically designed to be used in conjunction with credit facilities drawn on a local bank or perhaps a non-financial lender (DIP lender or potential buyer of the facility) that is not regularly engaged in patient accounts receivable financing. Once installed, HMP will monitor the process on behalf of the lender on an ongoing basis.

## Third Party Payor Payment Pattern Analysis

Because the database we have designed for the Patient Accounts Receivable Financing Borrowing Base Calculation or BBC Database, contains virtually 100% of all patient accounting activity (billing, collections, adjustments, etc.), it is a relatively simple matter to reorganize the data to prepare a comparative analysis of the historical payment patterns of all third party payors.

In turn, this information can be used to either address weaknesses in the Hospital's revenue cycle management or, with the advice of legal counsel, enable the hospital to demand "specific performance" on the part of individual payors to address non-compliance with contract payment terms.

## Bankruptcy Administration

In an effort to create efficiency and reduce professional fees charged to estates of healthcare providers in bankruptcy, HMP has developed the following automated tools:

- 13 and 26 Week Cash Flow Model
- Monthly Operating Report (MOR)
- Court Supervised Professional Fee Application

## Customized Data Mining and Analysis

Most business transactions are now completely electronic. A strong reliance on databases and automated workflows has led to an increased demand for the collection and analysis of electronic information.

*Statement of Qualifications*

Our professionals offer a hands-on approach to collecting and analyzing information found in large databases and leverage our findings to create comprehensive reports used in investigations and litigation.

Our experts have worked with database formats such as Oracle, SQL Server and Informix, among others, as well as most major hospital information systems. We focus on helping clients uncover essential electronic information to help solve complex problems.

In addition, we license and are expert at the analysis of data contained in the *Healthcare Cost Report Information System* (*HCRIS*) and *Medicare Provider Analysis and Review* (*MEDPAR*) federal databases as well as state level Medicaid and patient billing databases to determine competitive cost structures, market share, and prepare analysis related to allegations of fraud and abuse or other corporate compliance issues.

**Our Data Mining and Data Analysis services include:**
- Identification of Key Financial Systems
- Preservation and Extraction of Financial Databases
- Damages Calculations
- Analysis of Financial Databases
- Presentation Through Reports and Graphs
- Expert Testimony

*Statement of Qualifications*

# CLIENTS OUR PROFESSIONALS HAVE SERVED

## LAW AND ACCOUNTING FIRMS

- Bird Marella LLP
- Bradley Arant Boult Cummings LLP
- Brown McCarroll, LLP
- Fulbright & Jaworski LLP
- Decosimo
- Deloitte
- Gearhiser, Peters, Lockaby, Cavett & Elliott, PLLC
- Hogan & Hartson LLP
- Hooper, Lundy, and Bookman
- Jones Day
- Kantrow, Spaht, Weaver, & Blitzer
- KPMG
- Latham & Watkins
- Mancuso & Franco PC
- Milbank, Tweed, Hadley and McCloy LLP
- Patton Boggs
- Ramirez International, Inc.
- Whiteford Taylor Preston, LLP
- Schiavetti, Corgan, Soscia, DiEdwards and Nicholson, LLP

## INVESTOR-OWNED HOSPITALS OR HOSPITAL SYSTEMS

- Ameris Health Systems
- Doctors Hospital, Houston
- Doctors Hospital, Los Angeles
- HealthPlus
- Hospital Partners of America
- HealthSouth Corporation
- Hospital Corporation of America
- Hugh Chatham Memorial Hospital
- Hughston Hospital and Clinic
- Integra Healthcare
- Integrated Healthcare Holdings, Inc.
- Lakeside Hospital at Bastrop
- LifePoint Hospitals
- Monroe Hospital LLC
- Promise Healthcare
- Shasta Regional Medical Center
- St. Joseph Hospital, Houston
- Tenet Healthcare Corporation
- Vanguard Health Systems

## FINANCIAL / LENDING INSTITUTIONS

- Capital Source
- CIT
- Deutsche Bank Securities Inc.
- GE Healthcare Financial Services
- Healthcare Business Credit Corporation
- Medical Property Trust (REIT)
- Stillwater National Bank
- Wachovia

*Statement of Qualifications*

## CLIENTS OUR PROFESSIONALS HAVE SERVED *(CONTINUED)*

### Home Health

- Best Choice Home Health
- Columbia Home Care

### Not For Profit or Governmental Hospitals or Systems

- Baylor College of Medicine
- The Brooklyn Hospital Center
- Devereux Foundation
- Franciscan Health System
- General Health System
- Good Samaritan Hospital
- Hahnemann University Hospital
- Health Alliance of Cincinnati
- National Health Service, United Kingdom
- Legacy Health System
- Mercy Health System
- Natchez Regional Medical Center

- New York United Hospital Medical Center
- Nyack Hospital
- Rahway Hospital
- Raritan Bay Health System
- Robert Wood Johnson Health Network
- Sisters of Mercy Health System
- Southern Chester County Medical Center
- St Vincent's Catholic Medical Centers, New York
- Temple Health System
- Tri-Lakes Medical Center
- University Hospital Consortium of Pennsylvania

### Senior Care and or Continuing Care Retirement Communities

- Grace Care of Texas
- Jenner's Pond Continuing Care Retirement Community
- Life Care Centers of America
- Linden Ponds, Inc.
- Mercy Hospitals of Texas

- Monarch Landing, Inc.
- National Senior Campuses (Erickson Retirement Communities)
- Sedgebrook, Inc.
- St. Edwards (Ft. Smith, AR)
- St. Johns Nursing Home (St. Louis, MO)

### Payors and Managed Care Organizations

- Blue Cross of Tennessee
- Community Behavioral Health Network of PA

---

*Statement of Qualifications*

## CASE STUDIES – MANAGEMENT SERVICES

## SUCCESSFUL CHAPTER XI REORGANIZATION OF A BANKRUPT TWO-CAMPUS NOT-FOR-PROFIT HOSPITAL
### Turnaround Management and CRO

A sole community provider in central Mississippi filed for Chapter 11 protection three months prior to HMP being engaged. HMP was appointed as CRO by the court as the hospital was facing eminent closure.

### Issues
- Due to extensive Medicaid fraud, the bankrupt facility was facing almost certain liquidation.
- Financial malfeasance and insider dealings within the management company bred a corrupt management culture.
- Overbuilt physical plant resulted in over-leveraged and unsustainable capital structure.
- Poor physician relations had resulted in the loss of key medical staff.

### Approach
- Terminated predecessor Management Company.
- Eliminated programs with negative contribution margins.
- Recruited replacement ER, OB/GYN and hospitalist physicians.
- Conducted a complete forensic audit to support multi-million dollar claims against the former management company.
- Negotiated settlement with Medicaid for the forgiveness of more than $25 million liabilities due from the hospital.

### Results
- $15 million reduction in operating expenses.
- Obtained releases from Medicaid to extinguish prepetition overpayment liabilities, necessary to enable the hospital to be sold as an operating entity.
- EBITDA improvement of $8mm in first two years and patient volumes restored to pre-bankruptcy levels.
- Restored respect within the medical community.
- Convinced local disenfranchised quality physicians to bid on the hospital with a joint venture partner.
- Conducted a successful Section 363 sale of the hospital.

*Statement of Qualifications*

# SUCCESSFUL CHAPTER IX REORGANIZATION OF A FINANCIALLY DISTRESSED COUNTY-OWNED HOSPITAL
Turnaround Management and CRO

The board of a county-owned 179 bed general acute-care hospital needed to replace the management of the facility on an emergency basis. HMP was brought in to stabilize and restructure the financial and clinical operations of the hospital and to prepare for the possibility of filing for Chapter 9 bankruptcy.

**Issues**
- Unsustainable operating costs, especially salaries and benefits. Monthly losses were exceeding $1 million per month in the first quarter 2008.
- Less than seven days cash on hand.
- Inefficient capital and legal structure.
- Loss of key medical staff in the market.
- Physician contracts in violation of Stark guidelines.

**Approach**
- Terminated the predecessor national hospital management company which had been in place for over fourteen years.
- Reduced staffing levels by 30% in less than two months.
- Canceled or renegotiated all physician contracts and other vendor contracts, as necessary.
- Negotiated waivers from the bond trustee to enable the hospital to secure a $4.5 million line of credit to fund short term working capital needs
- Redesigned and modified charge master to optimize revenue capture.
- Developed and executed effective marketing strategy based on the needs of the surrounding community.
- Recruited or replaced ER, Radiology, Pathology, Cardiology, General Surgery and Orthopedic Surgery Physicians.
- Successfully used a Chapter IX reorganization to reject contracts and leases and restructure almost $4 million in old trade payables into a three year note.

**Results**
- Returned hospital to profitable operations in one year.
- Successful Chapter IX reorganization with all approved claims being settled at par.
- Successful restructuring of a number of physician joint ventures, including two imaging centers and various office facilities.
- Full compliance with Medicare regulations for all physician contracts and relationships.

*Statement of Qualifications*

## SUBURBAN NOT-FOR-PROFIT HEALTHCARE SYSTEM WITH A DISTRESSED CONTINUING CARE RETIREMENT COMMUNITY
Turnaround Management and CRO

A small suburban healthcare system with eight operating units, including a general acute care hospital and a 600 resident continuing care retirement community (CCRC) which was under development, was experiencing severe financial distress due to declining patient volumes and an inappropriate capital structure to fund the construction of the CCRC.

### Issues
- All eight operating units were experiencing negative EBIDTA margins due to inefficient staffing and poor operating model.
- CCRC's capital structure did not provide sufficient capital to fund the construction of both individual resident units and campus infrastructure.
- Low morale among nursing and medical staffs due to lack of management focus on quality improvement and training.
- Adversarial relations with local government over zoning and related issues.
- Cumbersome and costly management and governance structures.
- Serious corporate compliance issues resulting from incorrect patient coding and billing.

### Approach
- Sold or closed six of the eight operating units.
- Combined the hospital and the CCRC into a single corporation to create the asset base necessary to recapitalize the CCRC. Refinanced all existing debt and created the capacity to build out the CCRC.
- Replaced the existing hospital management with skilled staff.
- Immediately focused on patient quality care and staff training.
- Voluntarily disclosed corporate compliance issues to the US Department of Justice.
- Expanded patient service offerings, including opening the first new inpatient OB program in the market in more than 30 years.
- Developed an effective sales and marketing programs for the CCRC.

### Results
- Hospital was returned to profitability and successfully sold to a national publicly traded hospital company at a significant profit which was invested in a community foundation.
- On time and on budget completion of the CCRC including full occupancy of the independent living units and construction and occupancy of the assisted living and skilled nursing units. Sale of the CCRC to a regional not-for-profit operator of similar communities.
- Returned all facilities to full accreditation and licensure compliance.
- Settlement of all claims with Medicare and Medicaid without payment of penalties or interest or the requirement for a corporate integrity agreement.

*Statement of Qualifications*

## TEXAS NURSING HOMES
### Turnaround Management and CRO

A chain of six skilled nursing facilities defaulted on its debt with a large commercial healthcare lender. The lender engaged HMP to assess the viability of the provider and chart a possible turnaround. Ultimately, the lender foreclosed on the loan and engaged HMP as the turnaround agent.

**Issues**
- $2.5 million negative EBITDA due to inefficient staffing and poor operating model.
- Low occupancy due to low patient satisfaction, ineffective marketing and obsolete physical plants.
- Low morale among nursing staff due to lack of management focus on quality improvement and training.
- Lender was looking at a near total loss under the existing conditions.

**Approach**
- Consolidated two underperforming homes in the same market.
- Immediately focused on quality care and staff training.
- Implemented efficient staffing models to reduce costs.
- Developed an effective sales and communications strategy to effectively reach providers in each local market.
- Modernized and improved the physical plant to enhance the resident experience.

**Results**
- $3.5 EBITDA improvement.
- Returned all facilities to full accreditation and licensure compliance.
- Facilitated the successful sale of the facilities by the lender.


## INVESTOR OWNED SPECIALTY HOSPITAL COMPANY
### CRO Services and Sale of the Facilities

A chain of two inpatient rehabilitation hospitals in adjoining states defaulted on its debt with a large commercial lender and a privately held healthcare lender, and was ultimately forced into Chapter XI liquidation. HMP was engaged as CRO in bankruptcy to manage the facilities and conduct the required Section 363 sale.

**Issues**
- Due to poor financial and operational mismanagement, the company faced immediate liquidation unless a sale could quickly be brokered.

*Statement of Qualifications*

- Overbuilt physical plant resulted in over-leveraged and unsustainable capital structure.
- Inexperienced management had been hired to develop a national company while at the same time overseeing the startup of a new facility located in a very competitive market.
- Development of competing nearby facilities resulted in key physician admitters splitting their practices with those other locations.

## Approach
- Immediately secured DIP financing from the large commercial lender and established an agreed upon mechanism for accessing funds,
- Terminated remaining management and removed company owners from the facility,
- Initiated staff reductions and a hiring freeze, reviewed and approved all purchasing decisions
- Compiled existing marketing materials and financial data for distribution to parties interested in potential acquisition of the hospitals,
- The CRO oversaw all marketing efforts to these potential purchasers. Debtor's counsel, with support from the CRO, oversaw the auction and resulting negotiation and sale.

## Results
- The two rehabilitation hospitals remained open through the completion of the sale and change of ownership, thereby insuring uninterrupted patient care, the maximum value to the secured and unsecured creditors, and continued employment for the work force.
- Full compliance with all state and federal regulatory issues throughout the transition.
- The sale was completed in less than four months from the date of filing for Chapter 11 bankruptcy.

*Statement of Qualifications*

## CASE STUDIES – FINANCIAL ADVISORY

## ERICKSON RETIREMENT COMMUNITIES, INC.
## NATIONAL SENIOR CAMPUSES
**Financial Advisory**

In conjunction with the bankruptcy and ultimate sale of Erickson Retirement Communities, Inc. (ERC), HMP was engaged as financial advisor to National Senior Campuses (NSC), the not-for-profit counterparty at eighteen of the twenty ERC managed communities. At the time of the ERC bankruptcy, the NSC communities had over 22,000 residents and total assets in excess of $4 billion. The NSC communities were located in twelve different states, each with a unique regulatory environment.

**Issues**
- NSC was paying ERC over $40 million per year to manage its communities. These contracts represented the most valuable asset in the ERC estate.
- At the time of the ERC bankruptcy, NSC had advanced to ERC over $1.2 billion "Community Loan Obligations" to fund the continuing construction of twelve NSC communities which were then under development.
- Additionally, three NSC communities had advanced ERC an aggregate of over $600 million in tax-exempt bond proceeds to as a purchase deposit to be applied against the ultimate purchase of the real property.
- Excluding amounts owed to the NSC communities, ERC had commercial debt totaling more than $1.2 billion, which was spread across multiple overlapping banking syndicates with a total of 59 separate participants.
- For the twelve NSC communities then under development by ERC, each community's claims were legally subordinated to those of the banks and bond holders. Also, the community's licenses and resident and care agreements were pledged as collateral under its development agreements with ERC.
- Potential that the ERC obligations, including "Resident Purchase Refund Rights" would be rejected or modified in a foreclosure or bankruptcy proceeding.

*Statement of Qualifications*

**Approach**

- Terminated and renegotiated management contracts at all NSC communities into 30 day contracts which must be "affirmatively" renewed each month by each community to be extended for another 30 day period.
- Created an option for an "NSC Owned Management Company" as an alternative to ERC and secured a commitment from the eighteen community boards of directors to move forward if favorable terms could not be secured in the ERC bankruptcy and sale.
- Met with state regulators and secured commitment for a "Resident Centric" approach to any restructuring.
- Developed new master management and development contracts, which would be acceptable to the NSC communities as long-term contracts. This approach was designed to communicate to ERC's creditors and the potential buyers of ERC that the communities would be willing to commit to valuable long term agreements provided that they had a prominent role in the process.

**Results**

- Services were provided during the bankruptcy and sale on an uninterrupted basis for the 22,000 NSC residents
- NSC was able to dictate the terms of sale of ERC, in exchange for entering into ten year management contracts with the buyer. The new contracts included substantial new protections for the communities and their residents, including the right to terminate the agreements if stringent financial performance, employee and resident satisfaction criteria are not met by the new buyer.
- Designed and implemented a new business model for the financing of developing communities which provides a very specific guarantee of the individual resident's rights under the existing "Residence and Care Agreement" and obligates the developer to provide and repay working capital for the developing community prior to the collection of any cash rents.
- Reinstated all $1.2 billion of "Community Loan Obligations."

*Statement of Qualifications*

## BEHAVIORAL HEALTH MANAGED CARE COMPANY

### Company Advisor for the Strategic Assessment and Successful Sale of the Company

In the notoriously difficult field of behavioral health managed care (BHMCO), one not-for-profit provider owned organization grew into a major player in the Northeast by developing and executing an innovative care management model for behavioral health and developmental disabilities in partnership with government and commercial payers. Eager to reach more patients by expanding nationally, the BHMCO brought in Healthcare Management Partners as its financial and strategic advisor to examine its market position and capital structure and develop a plan for taking to expand nationally.

### Issues
- The organization was corporately organized as a charitable not-for-profit cooperative which could not be sold or merged into another entity.
- Changing the corporate form would require the unanimous consent of the 48 existing members of the cooperative and the state attorney general.

### Approach
- Analyzed critical trends in behavioral health; especially behavioral health managed care and the applicable Medicaid and Medicare rules and regulations.
- Converted the company from a not-for-profit provider owned Pennsylvania Cooperative Corporation to a for-profit stock corporation.

- Conducted a sales process to find a national strategic partner with a proven record for working with state Medicaid programs and delivering quality patient care to the developmentally disabled and ready access to the capital and appropriate insurance licenses necessary to facilitate rapid expansion across state lines.

### Results
- The company was successfully converted to a for profit stock company.
- The company was sold to the largest provider of Medicaid managed care in the nation for an above market price.
- The small group of community based provider organizations which were the original owners of the company received $40 million in exchange for their stock which they in turn could invest in their continuing charitable missions.

*Statement of Qualifications*

## PUBLICLY TRADED HOSPITAL SYSTEM
### Advisor to the Public Accounting Firm for the Initial Audit and Preparation of Form 10K

A publicly traded shell company which recently acquired four general acute care hospitals in southern California chose new independent accountants. The accounting firm was experienced in the audit of publicly traded companies but had never audited a healthcare provider.  The new accounting firm engaged HMP to assist it in the conduct of its initial audit of the company and preparation and review of the initial SEC Form 10K.

**Issues**
- Recruitment, training and supervision of the accounting firm's professional staff,
- Application of Generally Accepted Accounting Principles (GAAP) and Generally Accepted Auditing Standards (GAAS) to the engagement, and
- Timely completion and filing of the Form 10K.

**Approach**
- Developed and documented a specific plan for the audit of the hospital specific components of the engagement.
- Assisted in the recruitment and training of all assigned professional staff.
- Directed on site, the fieldwork for the hospital specific components of the audit engagement.

**Results**
- Significant accounting issues related to the misclassification of an over $300 million per year patient accounts receivable factoring operation were identified and addressed in the audit report and Form 10K filing.
- Audit was timely completed and the Form 10K filed

## 300 BED COMMUNITY HOSPITAL
### Hospital Advisor on Long Term Debt Restructuring

A struggling community hospital, unable to access the capital markets due to outdated and cumbersome tax-exempt bond covenants, engaged HMP to assist it in developing and implementing a strategy to secure sufficient capital to invest in new programs and facilities.

**Issue**
- Existing bond covenants which tied up significant cash in a debt service reserve fund and severely limited additional borrowing.

*Statement of Qualifications*

**Approach**
- Evaluated the hospital's existing financial condition and documented the prospective financial impact of the proposed strategic capital investment.
- Documented and secured board approval for a proposed new capital structure for the hospital.
- Solicited proposals to refinance the existing tax-exempt debt and provided the needed additional capital from commercial banks.
- Advised the hospital on the proposals received and assisted in negotiating the final loan terms.

**Results**
- Hospital timely closed on the required borrowing on favorable terms.
- The hospital is now the most profitable in its market.


## DEUTSCHE BANK'S HOME HEALTH CARE SERVICES GROUP

### Analysis of Proposed Changes to the Federal Payment Structure for Home Health Agencies

With the Centers for Medicare and Medicaid Services (CMS) proposing to cut home health spending by more than $6 billion over five years, Deutsche Bank's Home Health Care Services Group needed to assess the impact on investor owned home health provider companies that it tracks for investors. Deutsche Bank enlisted the expertise of HMP to analyze the highly complex proposed changes.

**Issues**
- How to model the proposed changes in the federal payment system.
- Completing the process in a timely manner so that it provides investors with information that has strategic value.

**Approach**
- Developed a multi-year data base of all Home Health Agency Medicare Cost Reports filed with CMS. This approach equipped the bank and HMP with the same data set being used by the regulators.
- HMP sorted and organized the information to analyze it by investor owned company and developed regional peer groups.
- HMP and Deutsche Bank team pulled together hundreds of data elements for the analysis, with a focus on such key metrics as episodes, visits and unit revenue. In turn, it modeled the financial impact of the proposed rule changes.

**Result**
- Deutsche Bank was able to develop revised earnings estimates for the home health sector and beat its banking competitors in issuing a highly focused report to investors.

*Statement of Qualifications*

## SECURED COMMERCIAL LENDERS TO HOSPITALS AND HOSPITAL SYSTEMS
**Creditor's Financial Advisor**

HMP has been retained by a number of large commercial lenders to act as their advisor in conjunction with the workout of secured obligations owed by both investor owned and not-for-profit hospitals and health systems. These assignments have included debt restructurings both in and out of bankruptcy.

**Issues**
- Debt covenant compliance
- Adequacy of the debtor hospitals business plans and management and their potential impact on the institutions ability to service the debt in question

- Quality of clinical operations, including the adequacy of medical and nursing staffs
- Medicare and/or Medicaid Fraud and Abuse

**Approach**
- Review the current situation with the secured lender's workout team.
- Have a Managing Director who is also an experienced hospital CEO, tour the facility, interview key members of the Hospital management, medical staff and board of directors, and evaluate current business plans and financial performance.
- Prepare a written assessment of the current situation for the secured lender, including specific action steps to collect or better secure the funds lent.

**Result**
- In every incidence to date the secured lender has made a full recovery.

*Statement of Qualifications*

## CASE STUDIES – LITIGATION SUPPORT AND EXPERT TESTIMONY

## "BIG FOUR" ACCOUNTING FIRM

### Expert Testimony

A "Big Four" public accounting firm was the named defendant in a certified class action by the shareholders of a large public hospital management company for allegedly failing to conduct its examination of the company's financial statements in accordance with generally accepted auditing standards (GAAS) in that the audited financial statements failed to adequately disclose alleged overbilling of Medicare by the company. HMP was engaged as the defendant accounting firm's healthcare industry and accounting expert.

### Issues

- The company which was originally named in the suit had already settled the case with the class actors for several hundred million dollars.

- Additionally the company had made substantial settlement on the same or related issues with CMS and the SEC; these two settlements aggregated almost $1 billion.

- The alleged misconduct by the company took place at more than 100 hospitals over a four year period.

- The accounting firm was aware of the Medicare reimbursement practices followed by the company and strongly maintained that their presentation in the company's financial statements was in accordance with then existing generally accepted accounting principles (GAAP) for hospitals and healthcare providers.

### Approach

- Using publicly available hospital data and HMP's expertise in Medicare reimbursement and hospital finance, HMP developed a proprietary statistical model to analyze more than 50,000 Medicare cost reports filed during an eight year period to definitively determine if other hospitals or health systems had engaged in Medicare reimbursement strategies similar to those employed by the company.

- Through its statistical modeling, HMP determined that the alleged overbilling of Medicare by the company was in fact a commonly practiced by approximately 20% of all hospitals during the relevant period.

- HMP then selected the "Top 200" hospitals that it identified as having practiced the alleged overbilling and examined their audited financial statements and/or SEC Form 10K, in the case of publicly traded hospital management companies, to determine if their independent accountants had treated the matter differently that the company. A total of almost 800 sets of financial statements were examined.

- HMP produced an expert report supporting its findings, including providing a detailed explanation in "layman's terms" of the applicable Medicare rules and regulations.

- An HMP Managing Director attended the depositions of the plaintiff's experts and was himself examined by plaintiff's counsel.

*Statement of Qualifications*

**Results**
- Almost 2,000 different hospitals, including some of the best known in the country and many owned by publically traded hospital management companies, were documented to have practiced the same billing practices as those of the company.
- Of the almost 800 sets of audited financial statements examined by HMP and audited by national accounting firms other than our client, none reported on the matter differently than our client accounting firm.
- During the relevant period, not a single publically traded hospital management company which participated in like conduct was found to have disclosed the matter differently in its form 10K filed with the SEC.
- The client and its outside counsel successfully negotiated the matter out of court for a fraction of estimated defense costs.

## NATIONAL LONG-TERM CARE PROVIDER

**Damages expert**

The nation's largest privately owned provider of long term care, with over 200 facilities located in 29 states, engaged HMP to evaluate the economic damages associated with an identified long term pattern pricing errors for drugs supplied company's institutional pharmacy vendor.

**Issues**
- The dispute revolved around the interpretation of contract terms, as well as the inconsistent application of those terms across more than 200 nursing homes located in 29 states over an eight year period.

- Because of the nature of the pharmaceutical business and its complicated pricing structures across state Medicaid programs, the assignment was very data intensive and involved the statistical sampling of millions of individual pharmacy records and detailed review of those samples.
- The institutional pharmacy had completed numerous acquisitions of small or regional competitors over the relevant period resulting in the existence many different accounting systems being used.

**Approach**
- HMP engaged a forensic economist from one of its corporate partners and together created a new pricing database utilizing the contract terms and the published pharmaceutical pricing per industry guidance.
- Developed a damage calculation using accepted statistical algorithms applied to the new data base.

*Statement of Qualifications*

**Result**
- The client and its outside counsel successfully negotiated the matter out of court.

## NOT-FOR-PROFIT MULTI-HOSPITAL SYSTEM

### Healthcare Industry Expert

A successful multi-hospital system, located entirely in a highly competitive state with no certificate of need (CON) requirements, had initiated a suit against a national hospital management company to recover damages resulting from the management company's gross negligence. Under the prior contract manager's supervision, the system's financial condition had dramatically deteriorated and the system was unable to gain access to long term debt financing to fund a planned hospital expansion in an important and rapidly growing market. As a result, the hospital lost key physician practices and market share to a large nearby competitor. HMP was engaged to determine the precise amount of operating profits lost as a direct result of the management company's failure to perform.

**Issues**
- How to quantify the effects of the market shift and patient migration due to the resulting lack of capacity at the hospital in question.
- Marginal cost that would have been associated with the lost volume.
- Political sensitivity of the physicians involved.

**Approach**
- Using publicly available data sources, HMP built a database of all inpatient admissions for the entire state for the relevant six year period.
- Using this database, HMP was able to determine actual patient admission patterns by hospital, physician, payor and DRG.
- Each physician on staff whose admitting patterns were documented to have changed during the relevant period was interviewed by an HMP Managing Director with extensive experience as a hospital CEO to confirm the specific reasons for the change in referral patterns, which were then documented.
- HMP developed a statistical model to establish the mathematical relationship between individual physician's inpatient utilization and outpatient utilization.
- The documented lost inpatient and outpatient volumes by payor were input into HMP's Hospital Operating Model to determine an accurate assessment of lost net patient revenue, marginal cost, and marginal profit for the relevant six year historical period as well as projected losses for an additional four years.

**Result**
- The client secured a settlement that compensated it for the projected lost operating profits.

*Statement of Qualifications*

## POST-ACQUISITION PURCHASE PRICE DISPUTE

**Arbitrator**

The Buyer and seller of a new community hospital were unable to reach an amicable settlement of a dispute regarding the purchase price working capital adjustment. The working capital adjustment was to be based on the hospital's audited financial statements and a separate Working Capital Agreement. Rather than rely on an arbitration panel that might not be familiar with the nuances of the hospital industry or hospital accounting issues, both parties chose to have their case heard and decided by HMP.

**Issues**
- Valuation of patient accounts receivable.
- Balance sheet classification of amounts due to Medicare related to overpayment for Medicare Outliers.
- Reclassification of a very large equipment lease from an operating to capital lease and the resulting impact on reported working capital.
- Proper classification on a long-term note that was in default as at the audit date.

**Approach**
- Developed a working knowledge of the relevant contracts and agreements.
- Organized the arbitration process, including establishing the calendar for discovery, exchange of expert reports, etc.
- Ruled on various pre-hearing motions by the parties.
- Presided over a two day hearing in which both sides presented testimony.

**Result**
- HMP rendered a reasoned opinion based on expert knowledge of the accounting and healthcare industry issues raised by the parties.

*Statement of Qualifications*

## DISTRESSED TAX EXEMPT BOND FUND

### Fraud Investigator

A very large distressed tax exempt bond fund purchased all of the then outstanding bonds issued on behalf of a then defunct urban nursing home chain for less than 1.5% of par. The bonds had been issued to finance the purchase of three large nursing homes by a university hospital system. All of the nursing homes were closed within three years of the acquisition.  Prior to selling the bonds, the bond trustee had tried unsuccessfully to build a legal case to hold the university hospital system directly responsible for repaying the bonds. HMP was engaged to assist counsel in building a case demonstrating that the university hospital system was directly responsible for the failure of the nursing homes through its own gross negligence.

**Issues**
- All of the nursing homes had been closed for more than three years at the time HMP was retained.
- Over two million pages of documents that were produced as part of the original suit by the bond trustee was available but in a highly disorganized manner.
- Each of the homes had been effectively closed by the state regulators for failure to meet basic patient care and life safety standards.

**Approach**
- HMP engaged a geriatrician and other geriatric clinical experts to assist in the investigation.
- HMP staff and legal counsel used multiple methods, including advertisements in the local media, to locate former managers, members of the medical and nursing staffs, state regulators who inspected the facilities, and former patients and members of their families.
- HMP conducted several hundred interviews with former staff, management, patients and state inspectors to document their perception of conditions within the facilities and the causes for their rapid decline and ultimate failure.
- An HMP Managing Director with extensive experience at the C Level with both university and multi-hospital health systems closely examined the sponsoring systems direct role in the management and governance of the nursing homes.
- HMP collaborated with counsel to combine the clinical aspects of the facility's decline with the parallel management and governance failures to create a compelling argument as to the specific causes for the facility's failure.

**Result**
- The bond fund and the university hospital system reached a settlement out of court that yielded a return in excess of 50% of par.

*Statement of Qualifications*

## CREDITOR'S LITIGATION TRUST

### Testifying Expert – Hospital Turnaround Management

The creditor's litigation trust (the "Trust") for the estate of a bankrupt not-for-profit multi-hospital system (the "System") engaged HMP to provide advice and expert testimony in support of its corporate malpractice litigation against the former turnaround management firm, the members of that firm who served as officers of the System, and the former special bankruptcy counsel to the System.

**Issues**
- Was the turnaround management firm grossly negligent in the conduct of its responsibilities?
- Did the parties actively withhold vital information from the System board of directors solely to protect their private economic interests?
- The Trust which was created as part of the approved plan of reorganization in the bankruptcy had limited resources to investigate the matter.

**Approach**
- HMP reviewed all reports produced by the turnaround firm during its 21 month tenure at the System including all board and board committee minutes for the period.
- HMP reviewed the work plans executed by the turnaround firm and the resulting written work product to determine if they met with acceptable standards for the professional turnaround management of a complex health care provider.
- HMP worked closely with counsel and the Trusts damages experts to quantify the damages resulting from the defendant's gross negligence.

**Result**
- The Trust secured a very favorable out of court settlement with each of the defendants.


## NATIONAL TOP TEN MEDICAL COLLEGE

### Testifying Expert – Hospital Operations and Faculty Practice Plan Financial Management

In the course of terminating a fifty year academic affiliation, a prominent hospital system and a medical college were caught in a dispute over the ownership of certain faculty practice, endowment and research funds held by the parties that aggregated more than $150 million. HMP was retained by the medical college to research the source and uses of those funds and opine as to the ownership of each individual fund.

**Issues**
- Because of the length of the relationship, many of the funds had little formal documentation governing the ownership of the funds or the distribution of the funds in the event that the relationship was terminated.

*Statement of Qualifications*

- Because many of the funds had evolved over many years as both parties expanded their respective operations, the source and use of cash flowing through the funds over many years had to analyze.

**Approach**
- HMP utilized its accounting knowledge and expertise in the inner workings of hospital finance to determine the flow of funds and ultimately the ownership of those funds.
- Our approach was to "follow the money" to its source and determine what actions generated the funds, what the intent of the payor or donor was, as well as how the funds were historically accounted for by both parties.
- HMP prepared an expert report and one of its Managing Directors, testified for two days and also attended all fifteen days of the arbitration proceeding where he assisted counsel.

**Result**
- The matter was settled for an undisclosed amount.

## MULTI-HOSPITAL NOT FOR PROFIT SYSTEM

### Consulting Expert – Medicare Fraud and Abuse

The heart hospital of a regional multi-hospital system was under government investigation stemming from a qui tam action alleging violations of the anti-kickback statute. The cardiologists on staff were being scheduled time at the diagnostic unit (heart station) based on case volume admitted to the hospital. HMP was asked to review the available information to assess any trends or patterns and advise the hospital and counsel in the course of the litigation and provide expert testimony as needed.

**Issues**
- The relator was a former cardiologist who had been terminated by the group.
- The perception of wrong doing was high because for a long period, access to the heart station was mathematically based on the invasive cardiology volume referred to the hospital by individual cardiologists or their group practice.
- Basing coverage of the heart station on volume is not unusual because this assigns the work to the physicians that are most likely to be in the hospital.
- Did the assignment to the heart station actually change any cardiologist's hospital referral patterns?

*Statement of Qualifications*

**Approach**
- HMP obtained a database of admissions for the years in question.
- Using its extensive data mining capabilities, HMP was able to evaluate competitor patterns, compare alternate methods of allocating time at the diagnostic unit, and review the more than 86,000 individual claims for certain criteria that should have excluded them from the investigation.

**Result**
- The system and the government successfully negotiated a settlement out of court.

## NATIONAL INVESTOR OWNED LONG TERM ACUTE CARE MULTI-HOSPITAL COMPANY

### Internal Medicare Fraud Investigator

During an internal review of the Medicare cost reports for two of its hospitals, the company noted a very unusual and material increase in reported telemetry charges. The increase in telemetry charges resulted in more than a $10 million increased Medicare outlier payments for a single year. HMP was engaged by the hospital's regulatory counsel and asked to review the medical necessity and documentation of the charges to ensure that they would be supported in the event of an audit or review.

**Issues**
- The hospitals had both been acquired the preceding year and converted from general acute care to long term acute care hospitals.
- The charge master in use at the time of the acquisition was not changed when the hospital was converted to an LTACH.
- The hospital rapidly expanded its telemetry capacity during the period in question.

**Approach**
- HMP engaged a geriatrician and other geriatric clinical experts to assist in the investigation.
- The geriatrician performed a detailed chart audit of 50 randomly selected medical records to evaluate the clinical appropriateness of the use of telemetry.
- HMP performed a 100% review of all patient medical records to determine if telemetry was documented as medically necessary in the medical record.
- HMP then used this information to recalculate the outlier payment to determine the amount (if any) of overpayment.
- HMP determined that the majority of the telemetry charges were either medically unnecessary or not clinically supported in the patient's medical record. HMP further determined that the amount of the telemetry charge was similarly unsupportable on any basis other than as a means to maximize Medicare outlier revenues.

*Statement of Qualifications*

**Results**
- The information was submitted to hospital counsel for further investigation and proper disposition.
- Documentation issues were reviewed with management to discuss additional training and procedures to ensure strict compliance with documentation requirements.

## GENERAL ACUTE CARE HOSPITAL

### Expert Testimony – Accounting Malpractice

The hospital brought suit against its former "Big Four" accounting firm for failing to conduct its examination of the hospital's financial statements for three consecutive years in accordance with Generally Accepted Auditing Standards (GAAS).

**Issues**
- Valuation of patient accounts receivable.
- Accounting treatment and financial statement disclosure of a material subsequent event.
- Required communications to the hospital's board of directors by its independent accountants.

**Approach**
- HMP reviewed the accounting firm's work papers for the years in question.
- Interviewed members of hospital management.
- Reviewed selected work papers and analysis prepared by the hospital's successor auditors.
- Prepared an expert report, which hospital counsel elected to voluntarily provide to the accounting firm's legal counsel.

**Result**
- After reviewing HMP's report, the accounting firm, requested non-binding mediation, at which a negotiated settlement was promptly reached.

*Statement of Qualifications*



1185 Avenue of the Americas
30th Floor
New York, NY 10036
(212)461-4242 Office
(267) 804-3885 Mobile
(215) 689-4386 Fax
sphillips@hcmpllc.com

## Scott Phillips, Managing Director

Scott has more than 30 years of healthcare industry management and consulting experience. Prior to founding HMP in 1997, he served as the president and chief executive officer of the 636-bed Academic Medical Center, as national partner and regional healthcare practice director for Touche Ross & Co., and as the chief financial officer of a faith-based multihospital system operating 12 hospitals across seven states.

Scott has significant management and consulting experience with government, tax-exempt and investor-owned healthcare service providers. He understands the organization and delivery of high-quality health services, including the role of corporate and medical staff governance during difficult periods of transition. Scott has executive level experience with mergers, acquisitions and turnaround situations, including restructuring in bankruptcy. In all of his many healthcare provider turnaround assignments, he has successfully designed and implemented plans that simultaneously added patient volume and revenues while conserving cash and reducing unit costs. He understands this approach builds on the organization's strengths and attracts the support of the local community and medical and nursing staffs, which is essential for the long-term provision of quality healthcare services.

Over the past several years, Scott has served as the chairman and CEO of an investor-owned healthcare provider with operations in 15 states and chief executive officer of a publicly traded medical staffing company with more than 2,000 employees. Both turnaround assignments included the crises management of complex organizations in the early stages of high profile criminal and civil fraud investigations by multiple federal agencies.

Scott has expert knowledge of the bankruptcy process as well as its implications and obligations on an operating provider of healthcare services.  He recently led the successful financial turnaround and Chapter 9 reorganization of a 179-bed county-owned hospital.

Recently he was the financial advisor to 18 of the tax exempt continuing care retirement communities with more than 20,000 residents in twelve states, affected by the bankruptcy and sale of Erickson Retirement Communities.

Scott graduated from the University of Florida with a Bachelor of Science in accounting. He is a licensed certified public accountant and member of numerous professional organizations. He is currently serving Leader Special Projects, Healthcare Committee, American Bankruptcy Institute.

*Statement of Qualifications*



9595 Six Pines
Building 8, Level 2, Suite 8210
The Woodlands, TX 77380
(713) 968-6521 Office
(214) 701-9990 Mobile
(866) 422-6176 Fax
mmorgan@hcmpllc.com

## Michael Morgan, Managing Director

Michael is a former hospital chief executive officer with more than 30 years of experience in healthcare management. He brings expertise and talent for turning around ailing healthcare providers and optimizing healthy organizations.

In his 25-year career at the Sisters of Mercy Health System, Michael was responsible for turning around five of the system's 19 hospitals. He served as president and chief executive officer for several Sisters of Mercy hospitals, including St. John's Mercy Health Care, which has an excess of $800 million in operating revenues, employs more than 8,000 individuals and includes the system's flagship 957-bed teaching hospital. As the CEO, he has set successful new strategies, improved clinical and administrative operations and changed organizational cultures. His trademark is developing capable management teams that in turn increased service quality, employee and medical staff satisfaction, patient volume, profitability and maximized cash flow.

After leaving the Sisters of Mercy system, Michael served as the chief restructuring officer and CEO for a two-hospital, investor-owned system in Texas. In eight months, he led the successful turnaround, emergence from bankruptcy and recapitalization of the hospitals by a physician-led limited partnership. He led the turnaround of a chain of five nursing homes in Texas and the bankruptcy turnaround of a two-campus, acute-care hospital in Mississippi. He was the oversight MD for a two campus rehab and specialty hospital chapter 11 bankruptcy. Recently served as the CRO for three individual CCRC's under a large CCRC management company bankruptcy. Provide financial advisory services for a large investment banking group on a 500 bed hospital system.

Michael holds a Bachelor of Science in business administration from the University of Science and Arts of Oklahoma and a Master of Science in business administration from the University of Central Oklahoma. He is a fellow of the American College of Healthcare Executives and has served as an officer or director of numerous hospitals and business organizations, including a 280,000-member for-profit health insurance plan.

*Statement of Qualifications*



243 East Glenn Drive
Phoenix, AZ 85020-4862
(602) 363-1140 Mobile
(866) 794-9501 eFax
bbuchanan@hcmpllc.com

## Bruce Buchanan, Managing Director

Bruce has more than 30 years of experience in the healthcare field and is a senior healthcare executive with a successful track record in both the not-for-profit and investor-owned sectors. He possesses multimarket experience at the hospital and health system chief executive officer level. He has deep experience and expertise in revenue growth, physician collaboration/integration, organizational development, productivity improvement and quality enhancement.

Before joining HMP, Bruce served as CEO of Phoenix Baptist Hospital, where he turned around the distressed 236-bed teaching hospital by reducing operating costs while enhancing the quality of care. Bruce led a similar turnaround of Northeast Baptist Hospital in San Antonio, including recruiting new physicians, doubling the hospital's physical space and growing market share. He also served as president and CEO of Atlanta Medical Center and Mercy Health System Oklahoma and its Mercy Health Center in Oklahoma City. Bruce held senior management positions with Hillcrest Healthcare System and Saint Joseph Hospital and worked for Invalesco Group as an operations consultant to healthcare organizations.

Most recently with HMP Bruce served as Chief Restructuring Officer for a rehabilitation hospital company with two facilities. He successfully led the company through a Chapter 11 bankruptcy process and a Section 363 sale to a new, privately held owner. He also served as CEO of a county hospital and guided it through a Chapter 9 bankruptcy, which resulted in all unsecured creditors receiving three year notes for full payment plus interest.

Bruce has a Bachelor of Arts in sociology from Princeton University, a Master of Health Services Administration from University of Michigan, and a Master of Business Administration from George Mason University. He is board-certified in healthcare management and a Fellow in the American College of Healthcare Executives. He also holds membership in the Turnaround Management Association.

*Statement of Qualifications*



2001 Park Place
Suite 1400
Birmingham, AL 35203
(205) 202-0459 Direct
(615) 584-0719 Mobile
(615) 523-1835 Fax
dpierce@hcmpllc.com

## Derek Pierce, Managing Director

Derek has over 20 years of professional experience focused solely in the healthcare industry having served as chief financial officer, chief restructuring officer, director of reimbursement, court-appointed examiner, Medicare auditor, Medicare cost report preparer, forensic accountant, compliance consultant, financial auditor, and financial advisor. He has audited, managed and consulted with all types of healthcare providers including government owned, community not-for-profit, academic, and investor-owned entities.

Most recently, Derek served as the restructuring chief financial officer of a two-campus, not-for-profit hospital in Chapter 11 bankruptcy. In addition to his CFO responsibilities, he led the Section 363 sale process and conducted a forensic review into the circumstances that led to the hospital's bankruptcy filing. Throughout the project, Derek worked closely with senior lenders, debtor-in-possession lenders and the applicable federal loan program to a successful plan of reorganization.

Starting his career with the Medicare fiscal intermediary as a Medicare auditor, Derek developed deep expert knowledge of the patient revenue cycle, third-party contracting, Medicare and Medicaid rules and regulations. He is expert in the areas of corporate and regulatory compliance and forensic accounting in conjunction with the defense of civil and criminal fraud claims or allegations. He led teams conducting forensic analysis in support of settlement negotiations with the government at both Hospital Corporation of America (HCA) and HealthSouth Corporation, two of the largest and most complex civil fraud settlements in history.

Derek has served as an interim COO of a Chapter 11 investor-owned medical practice and home health company operating in fifteen states. During this assignment, he negotiated the settlement and release of Medicare civil fraud claims enabling the successful Section 363 sale of the company's operating units. Derek has also served as financial advisor to the official committee of unsecured creditors for a large urban teaching hospital in bankruptcy.

In his career, Derek has led or participated in interim management and consulting assignments for more than 40 healthcare providers, including Baptist Memorial Health Care, National Health Service (United Kingdom) Washington Hospital Center, Lifepoint Hospitals, Tampa General Hospital, Legacy Health System and IASIS Healthcare.

Prior to joining HMP as a managing director, Derek was a Director with Alvarez & Marsal in its New York based Healthcare practice. Before that, he was a senior manager with Arthur Andersen in its Atlanta based healthcare consulting practice.

Derek is a graduate of Samford University with a Bachelor of Science in accounting and is a member of numerous professional associations.



## IN RE: RAD/ONE, P.A., d/b/a DELTA DIAGNOSTICS, DEBTOR.

### CASE NO. 08-15517-NPO, CHAPTER 11

### UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF MISSISSIPPI

*2009 Bankr. LEXIS 417; Bankr. L. Rep. (CCH) P81,431*

### February 24, 2009, Decided

**COUNSEL:** [*1] For RAD/ONE, P.A., dba Delta Diagnostics, Debtor: Jeffrey A. Levingston, Levingston & Levingston, PA, Cleveland, MS; Paul M. Ellis, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, MS.

For U. S. Trustee, U.S. Trustee: Christopher James Steiskal, Jackson, MS.

**JUDGES:** NEIL P. OLACK, U.S. BANKRUPTCY JUDGE.

**OPINION BY:** NEIL P. OLACK

**OPINION**

## MEMORANDUM OPINION AND ORDER GRANTING MOTION TO DISPENSE WITH APPOINTMENT OF PATIENT CARE OMBUDSMAN

On February 4, 2009, there came on for hearing (the "Hearing") the Order Directing Appointment of Patient Care Ombudsman (Dk. No. 6) (the "Order") issued by the Court; the Motion to Dispense with Appointment of Patient Care Ombudsman (Dk. No. 22) (the "Motion") filed by RAD/ONE, P.A. (the "Debtor"); and, the United States Trustee's Response to Motion to Dispense with Appointment of a Patient Care Ombudsman (Dk. No. 23) (the "UST's Response") filed by R. Michael Bolen, the United States Trustee for Region 5 (the "UST") in the above-styled chapter 11 proceeding. Jeffrey A. Levingston represented the Debtor, and Christopher James Steiskal represented the UST. The Court, being fully advised in the premises and having considered the pleadings, evidence, authorities, and arguments presented [*2] by counsel, finds as follows: [1]

1. The Debtor initiated this voluntary chapter 11 case by the filing of a petition (Dk. No. 1) (the "Petition") on December 23, 2008.

2. On the Petition, the Debtor indicated that the nature of its business is "Health Care Business."

3. On December 24, 2008, this Court entered the Order and directed the UST to appoint a disinterested person to serve as a patient care ombudsman [2] ("PCO") pursuant to *11 U.S.C. § 333* [3] unless a motion to dispense with the appointment was filed as provided in *Federal Rules of Bankruptcy Procedure 1021(b)* and *2007.2(a)*.

4. On January 22, 2009, the Debtor filed its Motion. On that same date, the UST filed the UST's Response.

5. At the Hearing on the Motion and the UST's Response, the Debtor took the position that a patient care ombudsman is not necessary "for the protection of patients" under the specific facts of this case. The UST asserted that the Debtor's contentions, on their own, were insufficient evidence to prove that a PCO is not necessary and that a hearing was required wherein the Debtor had "the burden to provide testimentary and documentary evidence to the Court regarding, but not limited to, the current level of patient [*3] care and whether the Debtor is in

EXHIBIT 2

2009 Bankr. LEXIS 417, *; Bankr. L. Rep. (CCH) P81,431

compliance with all state and federal regulatory requirements for patient care."

6. The question before the Court, then, is whether a PCO should be appointed for this health care business. The Court has considered a number of factors in determining whether a patient care ombudsman is needed. According to Collier on Bankruptcy, "[f]acts that warrant a decision not to appoint an ombudsman could include that the facility's patient care is of high quality, that the debtor has adequate financial strength to maintain high-quality patient care, that the facility already has an internal ombudsman program in operation or that the situation at the facility is adequately monitored already by federal, state, local or professional association programs so that the ombudsman would be redundant." 3 *Collier on Bankruptcy, § 333.02* (Matthew Bender 15th Ed. Rev. 2005).

7. James K. Morris ("Morris"), the president and owner of the Debtor, testified that the Debtor is a medical facility in Lake Village, Arkansas, which operates under the name of Delta Diagnostics. [4] Morris established that the Debtor provides only outpatient services, primarily upon physician referral. The [*4] services provided are radiographic studies and the interpretation thereof. Morris further testified that the Debtor does not provide follow-up care, but simply forwards the study reports to the patient's physician. Morris also stated that the Debtor has an established internal complaint process, that no recent complaints have been lodged, and that the Debtor is in compliance with all state and federal regulatory agency requirements. Finally, Morris attested that the Debtor's financial difficulties, which arose as a result of a payment dispute over a PET scanner, have not and should not affect patient care.

8. Application of the above-referenced factors to this case persuades the Court that the appointment of a PCO is not necessary for the protection of patients. *See § 333(a)(1); Fed. R. Bankr. P. 2007.2(a)*. The Debtor has established that it provides only outpatient care, which lessens the need for the appointment of a PCO to insure a continuity of day-to-day

care for patients. The Debtor also has implemented a basic internal ombudsman program to handle patient complaints, and is in compliance with regulatory agency requirements. *See In re 7-Hills Radiology, LLC, 350 B.R. 902 (Bankr. D. Nev. 2006)* [*5] (no patient care ombudsman appointed where radiological services were performed only at the request of a referring physician); *see also, e.g., In re Total Woman Healthcare Ctr, 2006 Bankr. LEXIS 3411, 2006 WL 3708164 (Bankr. M.D. Ga. Dec. 14, 2006)* (finding appointment of ombudsman unnecessary where debtor provided outpatient care at her office or performed medical procedures at area hospitals where hospital staff provided additional patient care, where no complaints had been received since bankruptcy filing, and where neither office staff nor patient scheduling had changed due to bankruptcy).

9. Nevertheless, should the Debtor experience any negative trend which indicates the need for the appointment of a PCO in the future, the Court anticipates the filing of an appropriate motion so that the Court might reconsider such an appointment. *See Fed. R. Bankr. P. 2007.2(b)* ("[T]he court, on motion of the United States trustee, or a party in interest, may order the appointment at any time during the case if the court finds that the appointment of an ombudsman has become necessary to protect patients.").

---

1   The following constitutes the findings of fact and conclusions of law of the Court pursuant to *Federal Rules of Bankruptcy Procedure 7052* [*6] and *9014*.

2   According to Collier on Bankruptcy, "[t]his ombudsman is, apparently, to serve as a 'patient advocate' - one who can speak for the consumers of the health care business's services who might have different interests than those of the health care business's creditors - monitoring the quality of patient care, representing the interests of patients and reporting to the bankruptcy court every 60 days on the status of patient care in the debtor's health care business." 3 *Collier on Bankruptcy, § 333.01* (Matthew Bender 15th Ed. Rev. 2005).

2009 Bankr. LEXIS 417, *; Bankr. L. Rep. (CCH) P81,431

3  *Section 333(a)(1)* provides that if the debtor in a case under chapter 11 is a health care business, the court "shall order . . . the appointment of an ombudsman to monitor the quality of patient care and to represent the interests of the patients of the health care business unless the court finds that the appointment of such ombudsman is not necessary for the protection of patients under the specific facts of the case."

4    Although the facility is located in Arkansas, the Debtor is a Mississippi corporation.

IT IS, THEREFORE, ORDERED that the Motion is well taken and that the appointment of a PCO is not nec-essary for the protection of patients in  [*7] the above-styled chapter 11 proceeding.

A separate final judgment consistent with this Memorandum Opinion will be entered by this Court in accordance with *Federal Rule of Bankruptcy Procedure 9021*.

SO ORDERED, this the 23rd day of February, 2009.

/s/ Neil P. Olack

NEIL P. OLACK

U.S. BANKRUPTCY JUDGE



**In the Matter of: THE TOTAL WOMAN HEALTHCARE CENTER, P.C., D/B/A JOYCE A. RAWLS, M.D., P.C, Debtor**

**Chapter 11, Case No. 06-52000 RFH**

**UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF GEORGIA, MACON DIVISION**

*2006 Bankr. LEXIS 3411*; *57 Collier Bankr. Cas. 2d (MB) 603*; *47 Bankr. Ct. Dec. 143*

**December 14, 2006, Decided**

**COUNSEL:** [*1]  For Movant: Ms. Elizabeth A. Hardy, Assistant United States Trustee, Macon, Georgia.

For Respondent: Mr. Neal Weinberg, Macon, Georgia.

**JUDGES:** Robert F. Hershner, Jr., Chief Judge.

**OPINION BY:** Robert F. Hershner, Jr.

**OPINION**

BEFORE

ROBERT F. HERSHNER, JR.

CHIEF UNITED STATES BANKRUPTCY JUDGE

*MEMORANDUM OPINION*

The United States Trustee, Movant, filed on November 9, 2006, a Motion Of The United States Trustee For Determination As To Whether Debtor Is A Health Care Business And, If So, For Appointment Of An Ombudsman. The Total Woman Healthcare Center, P.C., d/b/a Joyce A. Rawls, M.D., P.C., Respondent, filed a response on November 30, 2006. Respondent filed a supplemental response on December 4, 2006. Movant's motion came on for a hearing on December 5, 2006. The Court, having considered the evidence presented and the arguments of counsel, now publishes this memorandum opinion.

Respondent filed on October 17, 2006, a petition under Chapter 11 of the Bankruptcy Code. Respondent filed on October 31, 2006, its statement of financial affairs and bankruptcy schedules. The "meeting of creditors" was held on November 21, 2006. [1]

1   *11 U.S.C.A. § 341 (a) (West 2004).*

[*2]  Movant, in her motion, contends that Respondent is a "health care business" and asks that the Court order the appointment of a "patient care ombudsman." Respondent opposes Movant's request.

*Section 101(27A) of the Bankruptcy Code* provides:

(27A) The term "health care business"--

(A) means any public or private entity (without regard to whether that entity is organized for profit or not for profit) that is primarily engaged in offering to the general public facilities and services for--

(i) the diagnosis or treatment of injury, deformity, or disease; and

(ii) surgical, drug treatment, psychiatric, or obstetric care; and

(B) includes--
(i) any--

(I) general or specialized hospital;

Case 11-03877-jw    Doc 7    Filed 06/20/11    Entered 06/20/11 17:25:49    Desc Main
Document    Page 58 of 59

Page 2

2006 Bankr. LEXIS 3411, *; 57 Collier Bankr. Cas. 2d (MB) 603;
47 Bankr. Ct. Dec. 143

(II) ancillary ambulatory, emergency, or surgical treatment facility;

(III) hospice;

(IV) home health agency; and

(V) other health care institution that is similar to an entity referred to in sub-clause (I), (II), (III), or (IV); and

(ii) any long-term care facility; including any--

(I) skilled nursing facility;

(II) intermediate care facility;

(III) assisted living facility;

(IV) home for [*3] the aged;

(V) domiciliary care facility; and

(VI) health care institution that is related to a facility referred to in sub-clause (I), (II), (III),

(IV), or (V), if that institution is primarily engaged in offering room, board, laundry, or personal assistance with activities of daily living and incidentals to activities of daily living.

*11 U.S.C.A. § 110(27A) (West Supp. 2006).*

*Section 333 of the Bankruptcy Code* provides in part:

**§ 333. Appointment of patient care ombudsman**

(a)(1) If the debtor in a case under chapter 7, 9, or 11 is a health care business, the court shall order, not later than 30 days after the commencement of the case, the appointment of an ombudsman to monitor the quality of patient care and to represent the interests of the patients of the heath care business unless the court finds that the appointment of such ombudsman is not necessary for the protection of patients under the specific facts of the case.

(2)(A) If the court orders the appointment of an ombudsman under paragraph (1), the United States trustee shall appoint 1 disinterested person (other than the United States trustee) [*4] to serve as such ombudsman.

. . .

(b) An ombudsman appointed under subsection (a) shall--

(1) monitor the quality of patient care provided to patients of the debtor, to the extent necessary under the circumstances, including interviewing patients and physicians;

(2) not later than 60 days after the date of appointment, and not less frequently than at 60-day intervals thereafter, report to the court after notice to the parties in interest, at a hearing or in writing, regarding the quality of patient care provided to patients of the debtor; and

(3) if such ombudsman determines that the quality of patient care provided to patients of the debtor is declining significantly or is otherwise being materially compromised, file with the court a motion or a written report, with notice to the parties in interest immediately upon making such determination.

*11 U.S.C.A. § 333 (a)(1), (2)(A), (b) (West Supp. 2006).*

2006 Bankr. LEXIS 3411, *; 57 Collier Bankr. Cas. 2d (MB) 603;
47 Bankr. Ct. Dec. 143

*Section 333(a)(1)* provides that the appointment of an ombudsman is mandatory *unless* the court finds that the appointment is not necessary for the protection of patients under the specific facts of the case.

The evidence presented [*5] at the hearing shows that Dr. Joyce A. Rawls is the CEO of Respondent. Dr. Rawls is the only physician employed by Respondent. Dr. Rawls is board certified in obstetrics and gynecology.

Dr. Rawls sees patients and performs physical exams, ultra sounds, and biopsies at Respondent's office. Other services provided by Dr. Rawls such as surgery, delivery, and outpatient surgery, are performed at two area hospitals. The hospitals provide nursing services, food, rooms, supplies, and other items and medical services while the patients are in the hospital.

Respondent has the equipment necessary for Dr. Rawls to treat patients at Respondent's office. Respondent's financial distress has not affected patient care. Respondent has the same staff as before the bankruptcy filing. Dr. Rawls has not received any complaints from patients since Respondent filed for bankruptcy relief. Respondent's bankruptcy has not affected Dr. Rawl's scheduling of appointments for patients.

If a patient decides to see another physician, the patient is provided with a copy of her medical records. If a patient has a complaint with Dr. Rawls medical services, the patient can file a complaint with the state medical board. [*6] Dr. Rawls understands that the law would require that Respondent maintain medical records for several years if Respondent went out of business.

The Court has reviewed Respondent's statement of financial affairs and bankruptcy schedules. Most of Respondent's obligations appear to be for taxes. The obligations do not appear to arise from deficient patient care.

The Court, from the evidence presented, is not persuaded that the appointment of an ombudsman is necessary for the protection of patients. Patient care has not been adversely affected by Respondent's bankruptcy filing. Respondent's obligations do not appear to arise from deficient patient care. Dr. Rawls understands her obligation to maintain patient records and to provide copies of the records to patients who decide to see another physician.

The Court, having determined that the appointment of an ombudsman is not necessary under the specific facts of this case, need not decide whether Respondent is a "health care business."

An order in accordance with this memorandum opinion will be entered this date.

DATED this 14th day of December, 2006.

/s/ Robert F. Hershner, Jr.

Chief Judge

United States Bankruptcy Court